Justice Thomas,
concurring.
I join the Court’s opinion, which, as a matter of administrative law, correctly upholds the Federal Communications Commission’s (FCC) policy with respect to indecent broadcast speech under the Administrative Procedure Act. I write separately, however, to note the questionable viability of the two precedents that support the FCC’s assertion of constitutional authority to regulate the programming at issue in this case. See Red Lion Broadcasting Co. v. FCC, 395 U. S. 367 (1969); FCC v. Pacifica Foundation, 438 U. S. 726 (1978). Red Lion and Pacifica were unconvincing when they were issued, and the passage of time has only increased doubt regarding their continued validity. “The text of the First Amendment makes no distinctions among print, broadcast, and cable media, but we have done so” in these cases. Denver Area Ed. Telecommunications Consortium, Inc. v. FCC, 518 U. S. 727, 812 (1996) (Thomas, J., concurring in judgment in part and dissenting in part).
In Red Lion, this Court upheld the so-called “fairness doctrine,” a Government requirement “that discussion of public issues be presented on broadcast stations, and that each side of those issues must be given fair coverage.” 395 U. S., at *531 369, 400-401. The decision relied heavily on the scarcity of available broadcast frequencies. According to the Court, because broadcast spectrum was so scarce, it “could be regulated and rationalized only by the Government. Without government control, the medium would be of little use because of the cacophony of competing voices, none of which could be clearly and predictably heard.” Id., at 376. To this end, the Court concluded that the Government should be “permitted to put restraints on licensees in favor of others whose views should be expressed on this unique medium.” Id., at 390; see also id., at 389 (concluding that “as far as the First Amendment is concerned those who are licensed stand no better than those to whom licenses are refused”). Applying this principle, the Court held that “[i]t does not violate the First Amendment to treat licensees given the privilege of using scarce radio frequencies as proxies for the entire community, obligated to give suitable time and attention to matters of great public concern.” Id., at 394.
Red Lion specifically declined to answer whether the First Amendment authorized the Government’s “refusal to permit the broadcaster to carry a particular program or to publish his own views[,]... [or] government censorship of a particular program,” id., at 396. But then in Pacifica, this Court rejected a challenge to the FCC’s authority to impose sanctions on the broadcast of indecent material. See 438 U. S., at 729-730, 750-751; id., at 742 (plurality opinion). Relying on Red Lion, the Court noted that “broadcasting . . . has received the most limited First Amendment protection.” 438 U. S., at 748. The Court also emphasized the “uniquely pervasive presence” of the broadcast media in Americans’ lives and the fact that broadcast programming was “uniquely accessible to children.” Id., at 748-749.
This deep intrusion into the First Amendment rights of broadcasters, which the Court has justified based only on the nature of the medium, is problematic on two levels. First, instead of looking to first principles to evaluate the constitu *532 tional question, the Court relied on a set of transitory facts, e. g., the “scarcity of radio frequencies,” Red Lion, supra, at 390, to determine the applicable First Amendment standard. But the original meaning of the Constitution cannot turn on modern necessity: “Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad.” District of Columbia v. Heller, 554 U.S. 570, 634-635 (2008). In breaching this principle, Red Lion adopted, and Pacifica reaffirmed, a legal rule that lacks any textual basis in the Constitution. Denver Area, supra, at 813 (Thomas, J., concurring in judgment in part and dissenting in part) (“First Amendment distinctions between media [have been] dubious from their infancy”). Indeed, the logical weakness of Red Lion and Pacifica has been apparent for some time: “It is certainly true that broadcast frequencies are scarce but it is unclear why that fact justifies content regulation of broadcasting in a way that would be intolerable if applied to the editorial process of the print media.” Telecommunications Research & Action Center v. FCC, 801 F. 2d 501, 508 (CADC 1986) (Bork, J.).
Highlighting the doctrinal incoherence of Red Lion and Pacifica, the Court has declined to apply the lesser standard of First Amendment scrutiny imposed on broadcast speech to federal regulation of telephone dial-in services, see Sable Communications of Cal, Inc. v. FCC, 492 U. S. 115, 127-128 (1989), cable television programming, see Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 637 (1994), and the Internet, see Reno v. American Civil Liberties Union, 521 U. S. 844, 867-868 (1997). “There is no justification for this apparent dichotomy in First Amendment jurisprudence. Whatever the merits of Pacifica when it was issued[,]... it makes no sense now.” Action for Children’s Television v. FCC, 58 F. 3d 654, 673 (CADC 1995) (Edwards, C. J., dissenting). The justifications relied on by the Court in Red Lion *533 and Pacifica — “spectrum scarcity, intrusiveness, and accessibility to children — neither distinguish broadcast from cable, nor explain the relaxed application of the principles of the First Amendment to broadcast.” 58 F. 3d, at 673; see also In re Industry Guidance on Commission’s Case Law Interpreting 18 US. C. §1464 and Enforcement Policies Regarding Broadcast Indecency, 16 FCC Red. 7999, 8021, n. 11 (2001) (statement of Commissioner Furchtgott-Roth) (“It is ironic that streaming video or audio content from a television or radio station would likely receive more constitutional protection, see Reno [v. American Civil Liberties Union, 521 U. S. 844 (1997)], than would the same exact content broadcast over-the-air”).
Second, even if this Court’s disfavored treatment of broadcasters under the First Amendment could have been justified at the time of Red Lion and Pacifica, dramatic technological advances have eviscerated the factual assumptions underlying those decisions. Broadcast spectrum is significantly less scarce than it was 40 years ago. See Brief for Respondent NBC Universal et al. 37-38 (hereinafter NBC Brief). As NBC notes, the number of over-the-air broadcast stations grew from 7,411 in 1969, when Red Lion was issued, to 15,273 by the end of 2004. See NBC Brief 37-38; see also FCC Media Bureau Staff Research Paper, J. Berresford, The Scarcity Rationale for Regulating Traditional Broadcasting: An Idea Whose Time Has Passed 12-13 (Mar. 2005) (No. 2005-2). And the trend should continue with broadcast television’s imminent switch from analog to digital transmission, which will allow the FCC to “stack broadcast channels right beside one another along the spectrum, and ultimately utilize significantly less than the 400 MHz of spectrum the analog system absorbs today.” Consumer Electronics Assn. v. FCC, 347 F. 3d 291, 294 (CADC 2003).
Moreover, traditional broadcast television and radio are no longer the “uniquely pervasive” media forms they once were. For most consumers, traditional broadcast media program *534 ming is now bundled with cable or satellite services. See App. to Pet. for Cert. 106a-107a. Broadcast and other video programming is also widely available over the Internet. See Stelter, Serving Up Television Without the TV Set, N. Y. Times, Mar. 10, 2008, p. Cl. And like radio and television broadcasts, Internet access is now often freely available over the airwaves and can be accessed by portable computer, cell phones, and other wireless devices. See May, Charting a New Constitutional Jurisprudence for the Digital Age, 3 Charleston L. Rev. 373, 375 (2009). The extant facts that drove this Court to subject broadcasters to unique disfavor under the First Amendment simply do not exist today. See In re Industry Guidance, supra, at 8020 (statement of Commissioner Furchtgott-Roth) (“If rules regulating broadcast content were ever a justifiable infringement of speech, it was because of the relative dominance of that medium in the communications marketplace of the past. As the Commission has long recognized, the facts underlying this justification are no longer true” (footnote omitted)).*
These dramatic changes in factual circumstances might well support a departure from precedent under the prevailing approach to stare decisis. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U. S. 833, 855 (1992) (asking “whether facts have so changed, or come to be seen so differently, as to have robbed the old rule of significant application or justification”); see also American Trucking Assns., Inc. v. Scheiner, 483 U. S. 266, 302 (1987) (O’Connor, J., dissenting) (“Significantly changed circumstances can make an older rule, defensible when formulated, inappropriate .. . ”). “In *535 cases involving constitutional issues” that turn on a particular set of factual assumptions, “this Court must, in order to reach sound conclusions, feel free to bring its opinions into agreement with experience and with facts newly ascertained.” Burnet v. Coronado Oil & Gas Co., 285 U. S. 393, 412 (1932) (Brandeis, J., dissenting). For all these reasons, I am open to reconsideration of Red Lion and Pacifica in the proper case.

With respect to reliance by FCC v. Pacifica Foundation, 438 U. S. 726 (1978), on the ease with which children could be exposed to indecent television programming, technology has provided innovative solutions to assist adults in screening their children from unsuitable programming — even when that programming appears on broadcast channels. See NBC Brief 43-47 (discussing V-chip technology, which allows targeted blocking of television programs based on content).