COMMITTEE FOR OPEN MEDIA, and
Community Coalition for Media
Change, Petitioners,

v.

FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents,

Focas Cable of Oakland, Inc., Intervenor.

No. 75–1007.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 9, 1975.

Decided March 31, 1976.

Curtis T. White, Washington, D. C., with
whom Ellen S. Agress, New York City, and
Frank W. Lloyd, III, Washington, D. C.,
were on the brief for petitioners.

Julian R. Rush, Jr., Counsel, F. C. C.,
Washington, D. C., with whom Ashton R.
Hardy, Gen. Counsel, Daniel M. Armstrong,
Acting Associate Gen. Counsel, F. C. C. and
Robert B. Nicholson, Atty., Dept. of Justice,
Washington, D. C., were on the brief for
respondents. Joseph A. Marino, Associate
Gen. Counsel, F. C. C., Washington, D. C.,
at the time the record was filed, also en-
tered an appearance for respondents.

Jay E. Ricks, Washington, D. C., with
whom Gardner F. Gillespie, Washington, D.
C., was on the brief for intervenor.

Before McGOWAN, TAMM and ROBB,
Circuit Judges.

PER CURIAM:

In 1972, the Federal Communications
Commission ("FCC" or "Commission") pro-
mulgated new rules for cable television sta-
tions ("CATV"). These rules required, *in-
ter alia*, that stations, after receiving local
franchises, obtain from the FCC certificates
indicating compliance with certain federal
requirements. Cable systems lawfully
broadcasting signals prior to March 31,
1972, were exempted, however. This ap-
peal challenges FCC orders which held that
a station's failure to have 50 paying sub-
scribers on the cutoff date did not prevent
grandfather status. We affirm the orders;
under the facts of this case, the rule is a
reasonable one which serves the public in-
terest in preventing disruption of service.

Focus Cable of Oakland received a nonex-
clusive franchise on November 19, 1970, for
a community cable station. Pursuant to
FCC regulations in effect at the time,[1] Fo-
cus filed notice in July of 1971 of its intent
to begin broadcasting. Since no objections

1. Section 74.1105 allowed franchised systems
to begin operations 30 days after giving notice
if no objections to the notice were filed. 47
C.F.R. § 74.1105(a), (c) (1971). If objections

were filed, Focus began service the following January in a small area known as the Skyline district.

In February of 1972, the FCC issued its Cable Television Report and Order, 36 FCC2d 143 (1972) ("Third Report"), which explained the new regulations affecting cable systems. Under these new rules, a cable system within a major television market like Oakland, see § 76.51(a)(7) (1974), was required to obtain a certificate of compliance indicating that the station conformed to access standards of section 76.251,[2] as well as the general franchise requirements of section 76.31.[3] Systems commencing operation before March 31, 1972, however, were exempted under the grandfather provisions:

> No cable television system lawfully carrying television broadcast signals in a community prior to March 31, 1972, shall continue carriage of such signals beyond the end of its current franchise period, or March 31, 1977, whichever occurs first, unless it receives a certificate of compliance.

47 C.F.R. § 76.11(b) (1974). *See also id.* at § 76.31(a)(6), (b) (franchise standards), § 76.65 (carriage of television broadcast signals), § 76.99 (preserving exclusivity rights). The Third Report explained that the grandfathering was based on "the difficulty of withdrawing signals to which the public has become accustomed" and on "deference to the equities of existing system operators." 36 FCC2d at 185.

Relying on these grandfathering rules, Focus filed Form 326–A[4] with the Commission certifying that it had 51 subscribers on March 31, 1972. A year and one half after the cutoff date, two public interest groups[5] concerned with CATV in the Oakland area filed a petition with the FCC alleging that Focus was in violation of section 76.11(a) of the Commission's rules because it had neither obtained a certificate of compliance nor qualified under the grandfathering provision of section 76.11(b). They supported their petition with three affidavits. Fred Grant, former manager of Focus, alleged that Skyline System was constructed in order to enable Focus to qualify as an existing system. J.A. at 16. An interviewer of residents within the Skyline neighborhood stated that of 12 persons interviewed only 7 were receiving cable and that 5 of the 7 stated that they were not paying for the service. *Id.* at 17–19. A third affidavit, that of a student doing cable research, revealed that Focus' manager had told him that the Skyline System was built to "beat the March 31 deadline." *Id.* at 8, 20. From these facts, petitioners asked the FCC to issue a show cause order demanding why the Commission should not issue a cease and desist order prohibiting further cable broad-

---

were entered, systems could not lawfully begin service until after the Commission's ruling on the objection. *Id.*

2. 47 C.F.R. § 76.251 (1974) requires systems in major television markets to provide at least 20 channels; a Class II or III channel for each Class I channel; capability for two-way communications; at least one channel each for public access, education and local government; and leasing of unused channels.

3. 47 C.F.R. § 76.31 (1974) establishes franchise standards for all cable systems, *e. g.*, less than 15 year lease, approved rates, and reasonable franchise fee (3–5% of gross subscriber revenues).

4. FCC Form 326–A accompanies payment of the cable television annual fee. Every cable television system must file the form on or before April 1 of each year. 47 C.F.R. § 76.406 (1974).

5. Focus and the FCC have also challenged the standing of these groups to bring this appeal. Although the Commission had granted administrative standing to petitioners as potential subscribers, it now vigorously argues that no judicial standing exists. *See* 3 K. Davis, Administrative Law Treatise § 22.08 (1958). Counsel for petitioners, while still arguing the need to provide standing for potential users of cable television, also alleged in oral argument that one member of the public interest groups is a Focus subscriber. Counsel was not allowed, however, to supplement the record by filing an affidavit to this effect. Order of Jan. 9, 1976. In light of the awkward posture of the standing issue in this case and because we hold that appellants can not prevail on the merits, we do not reach what might be a very difficult question of standing.

casting by Focus. The basic thrust of the complaint was that Focus could not qualify as a "cable television system" within the grandfathering provision of section 76.11(b) because it did not have 50 paying subscribers on the relevant date. Section 76.5(a) defines a cable television system as follows:

Any facility that, in whole or in part, receives directly, or indirectly over the air, and amplifies or otherwise modifies the signals transmitting broadcast by one or more television or radio stations and distributes such signals by wire or cable *to subscribing members of the public who pay for such service, but such term shall not include (1) any such facility that serves fewer than 50 subscribers*, or (2) any such facility that serves only the residents of one or more apartment dwellings under common ownership, control, or management, and commercial establishments located on the premises of such an apartment house.

The FCC, rejecting this request for a show cause order, held that the interview did not show that those who stated they were not paying for the service were among the original 51 subscribers. *Focus Cable of Oakland, Inc.*, 46 FCC2d 112, 115 (1974). Furthermore the FCC affirmed the principle laid down in cases involving grandfathering under the 1966 Rules that the jurisdictional requirement of 50 paying subscribers was not of decisional significance in determining whether a station was a cable system for purposes of the grandfather exemption.

Upon request for reconsideration, petitioners acknowledged that in light of Focus' expanded service a cease and desist order might be highly disruptive. They instead requested a ban on further expansion pending FCC resolution of an application for a certificate of compliance, or, at the least, a hearing to determine whether Focus qualified as an existing cable system in March of 1972. J.A. at 102–07. Petitioners also alleged erroneous findings of facts and applications of law by the FCC, *id*. at 81–99, but the FCC denied the petition for reconsideration as repetitive of facts and arguments

previously considered. 49 FCC2d 1284, 1286–87 (1974).

Petitioners then filed an appeal in this court pursuant to section 402(a) of the Communications Act of 1934, 47 U.S.C. § 402(a) (1970). They have presented two basic issues: (1) whether the FCC abused its discretion by finding that petitioners' evidence presented no prima facie violation requiring an order to show cause, and (2) whether failure to prove the existence of 50 paying subscribers places Focus outside the protection of the grandfathering provision.

■ We first consider the sufficiency of petitioners' evidence to sustain a prima facie case of violation by Focus. In finding the evidence insufficient, the Commission emphasized that the informal survey did not show that any of the persons interviewed had been subscribers on March 31. The FCC reasoned that absent such a showing there was no evidence to suggest that Focus' claimed 51 subscribers were not *paying* subscribers on March 31. While we agree that the interviewer's affidavit does not specifically identify the seven subscribers as among the March 31 group, one not paying for the service indicated that he had been "a charter member" and one of the first viewers. J.A. at 18. More important is the fact that Focus conceded that "most of the initial subscribers in the Skyline area received essentially free service under various billing arrangements." J.A. at 26. We cannot agree with the FCC if it is suggesting that the evidence does not present a *prima facie showing of nonpayment* by at least some subscribers. To the extent, however, that this factual showing is still insufficient to present a *prima facie case of violation*, we agree; the jurisdictional requirement of 50 paying customers is not an essential element of obtaining grandfathered status.

■ In reviewing the FCC determination regarding the interrelationship of the jurisdictional requirement and the grandfather exemption, we note again the deference that is due to an agency's interpretation of its own regulation. *See, e. g., Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381,

89 S.Ct. 1794, 1801, 23 L.Ed.2d 371, 383 (1969). This deference is particularly applicable when the agency's reading of the regulation is consistent over a long period of time. *Udall v. Tallman*, 380 U.S. 1, 17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616, 625, *rehearing denied*, 380 U.S. 989, 85 S.Ct. 1325, 14 L.Ed.2d 283 (1965). We therefore examine the ruling that the lack of 50 paying subscribers is not of "decisional significance" in light of a line of FCC cases beginning with *Meredith-Avco, Inc.*, 7 FCC2d 601 (1967).

In *Meredith-Avco*, the FCC determined that the station was grandfathered and thus not subject to the notification requirement of 47 C.F.R. § 74.1105. Even though the station served only a minimal number of subscribers and did not charge because of technical problems, it was "in operation" on February 15, 1966, the relevant grandfathering date under the pre-1972 rules. 7 FCC2d at 602. *See* 47 C.F.R. § 74.1105(d), –.1107(d) (1971) (exempting from notice and public interest showing requirements franchised systems which were supplying signals to subscribers on February 15, 1966). Upon reconsideration, the FCC granted a hearing to resolve a conflict presented by new evidence which indicated on one hand that no signals were being transmitted on or before February 15 and on the other hand that subscribers had indeed received signals prior to that date. 10 FCC2d 126, 127 (1967). Finding that service had been provided free to a few friends and relatives of system employees, the FCC still affirmed its prior decision to allow continued broadcasting. 16 FCC2d 689, 696 (1969). Although the grandfathering question was "a close one," the Commission determined that the "substantial entrenchment" of the system and the good faith operation entitled Meredith-Avco to a waiver of the notice requirement. *Id.*

This equivocal resolution of the grandfathering issue evolved further into a general rule disregarding the number and paying requirements in *Service Electric Cable TV, Inc.*, 32 FCC2d 334, 336–37 (1969). Citing *Meredith-Avco*, the FCC held that the cable system serving Hanover Township was grandfathered because it was serving 25 subscribers on the cutoff date.

> The primary public interest objective of the grandfather provisions was to avoid the disruption of an existing situation by withdrawing from CATV subscribers a signal which they were then receiving, and we do not deem it to be a matter of decisional significance that the supplier of the signal was serving less than the number of subscribers specified in Section 74.1101(a) on the February 15, 1966, date. The determinative factors, in our view, are that a CATV facility, whether or not in all respects a CATV system within the contemplation of Section 74.1101(a), was delivering the signals in question to a significant number of subscribers on the critical date.

*Id.* at 337. Despite what appeared to be a clear rule, the "significant number of subscribers" test still lacks definitive limits; although Hanover's 25 subscribers were sufficient and Meredith-Avco's 5–6 were a close question, 3 subscribers (one of which received free service) were insufficient to grant grandfathering rights in *Service Electric Cable TV, Inc.*, 51 FCC2d 1209, 1211 (1975). There is no evidence, however, that Focus did not have at least the limited number of paying subscribers approved in *Meredith-Avco*.

Petitioners allege that this rule, developed in response to grandfathering of systems in 1966, is inapplicable to the grandfathering provisions of the 1972 rules.[6] *Contra Richland County v. Palmetto Cablevi-*

---

**6.** Petitioners also cite *California Antenna T–V, Inc.*, 45 FCC2d 675 (1974), for the proposition that under the 1972 rules jurisdictional requirements are necessary for grandfathering. In *California Antenna*, the FCC refused to grant grandfather status to a system which had begun operation with free service in order to evade regulations. Because a petition of opposition had been filed after the company gave the required notice of its intention to begin broadcasting, California Antenna could not legally commence operations until the FCC ruled on the petition. 47 C.F.R. § 74.1105(c) (1971). *See also* 47 C.F.R. § 76.11(b) (1974) ("cable

*sion*, 261 S.C. 222, 199 S.E.2d 168, 174–75 (1973). In support of this position, they cite *Southern Illinois Cable TV Co.*, 44 FCC2d 460 (1973). Faced with the issue of grandfathering systems which had served 50 or more subscribers, all without charge, the FCC indicated in that case that the lack of paying customers was crucial under the new rules. The Commission distinguished cases under the 1966 provisions because "they served only to approve continued signal carriage" and, as a determinative factor, "the new cable television rules exact certain obligations from systems not deemed 'operational' as of March 31, 1972." *Id.* at 464.

In the case *sub judice*, however, Focus is already in compliance with the primary obligations imposed in 1972 and sought to be protected in *Southern Illinois*. Focus is operating under a franchise which substantially meets the requirements of section 76.-31. Although the 8% franchise fee exceeds the 5% maximum allowed in section 76.-31(b), Focus must comply by March 31, 1977; furthermore, it could have sought a waiver under section 76.31(a)(6), even if not grandfathered, as a system not in operation on March 31 but which had relied on an existing franchise in making significant financial investments.[7] In addition, Focus already provides more than the required number of channels and two-way capacity. Intervenor Focus' Br. at 9–11. Total compliance with the access standards of section 76.251 would require a separate channel for both local government and schools instead of the combined channel now available[8]

television system *lawfully* carrying television broadcast signals in a community prior to March 31, 1972. . . ."). In order to prevent the mandatory stay, the company began service without payment, thus attempting to remove itself from FCC control. Later, it claimed that this service, while not within FCC jurisdiction for purposes of section 74.1105, was grandfathered under the 1972 provisions. The Commission understandably rejected California Antenna's "cake-and-eat-it-too" attitude. 45 FCC2d at 676.

Similarly in *Southern Illinois Cable TV Co.*, 44 FCC 2d 460 (1973), the facts that Southern Illinois had never had paying subscribers and that it had commenced broadcasting unlawfully combined to compel a denial of grandfather status. *Id.* at 462–63 (service commenced without the required FCC determination that a signal extending beyond the station's grade B contour served the public interest).

Like the FCC, we believe that *California Antenna* and *Southern Illinois* are exceptions to, and not revisions of the *Meredith-Avco* rule. In the *Meredith-Avco* line of cases, the Commission has frequently noted the good faith or reasonable assumption of compliance of the cable system claiming grandfathered status. *See, e. g., TV Cable Co. of Stephenson County*, 46 FCC2d 150, 151 (1974); *Monroe All-Channel Cablevision, Inc.*, 45 FCC2d 764, 765 (1974); *see also Bellaire Tele Cable Company*, 50 FCC2d 521, 522 (1974); *Pacific Western Mobile Estates, Inc.*, 49 FCC2d 269, 271 (1974). Despite petitioners' arguments to the contrary, we do not believe that attempts to come within the grandfathering provision by implementing an operation like one previously approved is either sinister or evidence of bad faith. As pointed out by Focus, if the FCC had wished to prevent last-minute compliance with the provisions it would not have allowed advance notice as to the applicable date. In the Reconsideration of Cable Television Report and Order, the FCC stated:

> Grandfathering is essentially a balancing process. A line must be drawn somewhere. And wherever it is drawn there will be parties affected by the decision that would prefer the line to be drawn somewhere else. In establishing the cut-off date, we selected March 31 so that all rights of parties affected by the rule would vest or divest on the same day. This is not an inappropriate date because our former rules were in force until the effective date of the new rules.

36 FCC2d 326, 351 (1972). It is reasonable that the FCC expected systems commencing operation at this time to rely not only on these "former rules" but also on former interpretations of grandfathering. Unlike *Cable Antenna*, Focus has indicated its belief that it was covered under the provision by filing Form 326–A. We therefore agree with the FCC that the *Focus* decision fits within the general *Meredith-Avco* rule and can be distinguished from *California Antenna* and *Southern Illinois*.

7. We note also that the FCC, requiring only substantial compliance for franchises granted prior to the grandfathering dates, has upheld franchises in excess of the regulatory 15 year maximum and prescribing 4–7% franchise fees. *Southern Illinois Cable TV Co., Inc.*, 46 FCC2d 670, 671–72 (1974).

8. *Compare Monroe All-Channel Cablevision, Inc.*, 45 FCC2d 764, 766–67 (1974) (shared educational access channel with another cable channel); *Metro Cable Co.*, 39 FCC2d 169, 170–71 (1973) (joint public access and educational channel).

and Class II or Class III signal channels equal to the number of Class I channels. Since Focus has 18 Class I channels, this requirement would involve the addition of 6 additional Class II channels; Focus, however, already has 12 such channels, 2 more than would be required for a system using the minimal 20 channels. In addition to the oblique references in *Southern Illinois*, consideration of substantial compliance with the substantive regulations is consistent with FCC action in other cases. *See, e. g., Palmetto Cablevision, Inc.*, 47 FCC2d 925, 927 (1974) (CATV serving 9 homes); *cf. Service Electric Cable TV, Inc., supra*, 51 FCC2d at 1212 (pre-1972 authorization requires substantial compliance with franchise requirements).

We also believe the FCC's decision that Focus has met the grandfathering requirements is consonant with the rationale of other cases involving the 1972 rules. The Commission has determined that systems were operational in spite of mechanical failures, *Buffalo Televents Inc.*, 42 FCC2d 1025, 1026 (1973); *Metro Cable Co.*, 39 FCC2d 169, 170 n.2 (1973); where subscriber fees were provided initially by the cable system, *TV Cable Co. of Stephenson County*, 46 FCC2d 150, 151 (1974); and where subscriber fees were not actually paid by the cut-off date, *Jackson County Cable Systems, Inc.*, 51 FCC2d 324, 325 n.3 (1975); *cf. Pacific Western Mobile Estates, Inc.*, 49 FCC2d 269, 270–71 (1974) (refusal to issue show cause order against nonconforming cable company not claiming grandfather status because it had not yet charged its 43 mobile home subscribers). Focus also encountered reception problems which may have prevented charging for all services in its early months of broadcasting. J.A. at 18–19.

The *Meredith-Avco* doctrine is based on the theory that disruption of service to subscribers is contrary to the public interest. Even where grandfather status is doubtful or denied, the Commission has often chosen to grant a waiver rather than to disrupt established viewer service. *See, e. g., Bellaire Tele Cable Company*, 50 FCC2d 521,

522 (1974); *Southern Illinois Cable TV Co., Inc.*, 46 FCC2d 670, 671 (1974); *Monroe All-Channel Cablevision, Inc.*, 45 FCC2d 764, 765 (1974); *cf. Service Electric Cable TV, Inc.*, 51 FCC2d 1209, 1211 (1975). This rationale is particularly convincing in the case before us since Focus' 51 subscribers of March 31, 1972, had grown to 700 subscribers by the time of petitioners' complaint, to more than 1300 subscribers at the time of the FCC order denying petitioners' request, and to more than 20,000 subscribers today. Intervenor Focus' Br. at 6. Petitioners' failure to object to Focus' presumed grandfather status for more than 18 months while the new system burgeoned convinces us that the FCC properly exercised its discretion in denying a show cause order as contrary to the public interest. Although the petition for reconsideration suggested a less disruptive remedy, its reiteration of the same facts and arguments previously rejected by the FCC did not entitle petitioners to the declaration or hearing requested.

For the reasons discussed above, we affirm the challenged FCC orders before us. We agree that petitioners failed to present a prima facie case of violation since grandfathering Focus is appropriate even if not all 51 of the subscribers were paying for the service on March 31, 1972. The sporadic evolution of the *Meredith-Avco* doctrine has left unilluminated many important guidelines, such as quantitative standards for "significant numbers of subscribers," and, at times, the imprecise distinctions drawn between the cases have required later explanation by the Commission. Even the FCC has acknowledged the confusion engendered in applying the pre-1972 revision to questions arising under the 1972 grandfather rules. *Community Cablevision Corporation*, 50 FCC2d 988, 990 (1975) (grandfathering communities rather than systems). We believe, nevertheless, that as applied to the specific facts of this case, the *Meredith-Avco* principle provides a sound basis for refusing to issue a show cause order.

*Affirmed.*