# Restrictions on Canadian Ownership of Federal Mineral Leases Under the Mineral Leasing Act of 1920

The provisions of 30 U.S.C. § 181, which bar ownership of leases under the Mineral Leasing Act of 1920 by citizens of a foreign country whenever the laws of that country deny "similar or like privileges" to U.S. citizens, reflect a reciprocity principle under which the United States would be able to respond in kind when another country restricts American investment in its minerals. Accordingly, the United States may take responsive steps "mirroring" Canadian restrictions on foreign investment in its mineral resources, so as to restore "similar or like privileges" between U.S. and Canadian citizens for purposes of § 181.

August 11, 1981

## MEMORANDUM OPINION FOR THE
## ASSISTANT ATTORNEY GENERAL, ANTITRUST DIVISION

You have informed us that the Administration is contemplating possible action responding to Canadian restrictions on foreign investment in its mineral resources. A principal legal question arising in this context is whether, consistent with 30 U.S.C. § 181, the United States may take responsive steps "mirroring" the Canadian restrictions on American investment in Canada by similarly restricting Canadian investment in American mineral resources, primarily by limiting Canadian ownership of federal mineral leases under the Mineral Leasing Act of 1920, 41 Stat. 437 (Act). Section 181 provides in pertinent part:

> Citizens of another country, the laws, customs, or regulations of which deny similar or like privileges to citizens or corporations of this country, shall not by stock ownership, stock holding, or stock control, own any interest in any lease acquired under the provisions of this chapter.

It might be argued that whenever another country like Canada places restrictions on foreign ownership of interests in its mineral resources, § 181 permanently bars the citizens of the other country from owning any interest in any lease under the Act. Support for this inflexible interpretation might be sought in § 181's prohibition on ownership of "any interest in any lease" by the citizens of another country whose laws deny Americans "similar or like privileges."

We do not believe this to be the proper construction of § 181. Under that provision, the bar on "any" ownership of "any" lease under the Act does not apply unless "the laws, customs, or regulations" of an-

250

other country "deny similar or like privileges to citizens or corporations of this country." The fact that another country takes steps to eliminate "similar or like privileges" does not, by itself, mean that this country would be barred from taking responsive action to restore "similar or like privileges" for purposes of § 181.[1] To read § 181 as preventing such responsive action would require the United States to adopt the rather draconian measure of cutting off all ownership interests of another country's citizens in federal mineral leases regardless how minimal the other country's restriction on foreign ownership of mineral resources may be, so long as the foreign restriction eliminated "similar or like" privileges. This interpretation disregards the apparent underlying purpose of § 181 to permit reciprocal relations between the United States and another country concerning ownership of each other's mineral resources.

Furthermore, the inflexible interpretation of § 181 disregards the principle that, under the Mineral Leasing Act, the Secretary of Interior has a "broad power" to manage federal mineral leases. *See Udall* v. *Tallman*, 380 U.S. 1, 4 (1965). Indeed, the Secretary is specifically delegated authority, *inter alia*, "to do any and all things necessary to carry out and accomplish the purposes of this chapter." 30 U.S.C. § 189. It seems plain that if another country were to eliminate "similar or like," responsive action to re-establish such a balance of privileges in a particular case may well effectuate the statute's purposes.

An interpretation of § 181 allowing "mirroring" action is consistent with the legislative history [2] and with what we understand to have been the Act's construction by the Department of the Interior, the agency charged with implementing it.[3] The sentence in § 181 dealing with "similar or like privileges" originated in the bill which became the Mineral Leasing Act of 1920 reported out by the House Committee on the Public Lands. The House Committee noted that its bill substituted

---

[1] All § 181 provides is that if another country does deny "similar or like privileges" to United States citizens, a bar on ownership of federal mineral leases takes effect. This leaves open the question whether, once another country takes such action, the United States may take responsive action restoring "similar or like privileges."

[2] *See United States* v. *American Trucking Ass'n*, 310 U.S. 534, 542–44 (1940) (for the principle that reliance on the purposes and history of a statute is appropriate in determining a statute's meaning).

[3] *See, e.g., Red Lion Broadcasting Co.* v. *FCC*, 395 U.S. 367 381 (1969) ("[T]he construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong. . . ."); *Udall* v. *Tallman*, 380 U.S. 1, 16 (1968) ("[w]hen faced with a problem of statutory construction, this Court shows great deference to the interpretation given the statute by the officers or agency charged with its administration"). An interpretation allowing "mirroring" responsive action is also consistent with the approach of 38 Op Att'y Gen. 476 (1936), which concluded that England should be regarded as a country in a "reciprocal" relationship with the United States for purposes of the Mineral Leasing Act. The Attorney General, while noting that certain requirements governing foreign investment under British law had no exact parallels in American federal law, reasoned that these special British restrictions "are not unduly restrictive or harsh, " and some of them might even be matched in some state corporation statutes. Thus, the Attorney General, in adopting a practical approach to the statute's interpretation, refused to embrace the extreme view that any restriction in foreign law not matched in American law necessarily prompts application of an absolute bar on foreign ownership of mineral leases.

251

language essentially identical to the present § 181 for a different Senate version [4] because, in its view, the Senate bill was too harsh and would be too likely to prompt retaliatory action by other countries:

> *The House amendment to this clause seeks to avoid retaliatory action against American investors in foreign countries and provides that no citizen of any foreign country shall, by stock ownership, stock holdings, or stock control, own any interest in any lease acquired under the provisions of this act where such foreign country, by its laws, customs, or regulations, denies similar or like privileges to citizens or corporations of this country.* The main argument for the Senate draft was that foreign control of domestic corporations operating a lease under the act would result in large exportations of oil, coal, and other minerals covered by the act, and thereby deplete the domestic supply. Under the House reciprocal clause above mentioned it is obvious that the citizens of the United States could largely offset such a result by their own operations in foreign countries, or, if an acute situation ever developed, a general embargo against exportation would be a sufficient remedy.

H.R. Rep. No. 398, 66th Cong., 1st Sess. 11 (1919) (emphasis added). During floor debate on the House bill, its sponsor, Congressman Sinnott, engaged in the following colloquy with Congressman Snell:

> Mr. Snell: As I understand it, the British Government does not allow any alien to own any oil lands under the control of that Government. According to this act, what would be the result if a British subject owned stock in any one of our oil companies? What would be the situation in which he would find himself?
>
> Mr. Sinnott: *If the British Government discriminates against us, we meet that discrimination by denying to its citizens the rights that are withheld from us.*
>
> Mr. Snell: If I were a British subject and held some stock in one of these oil companies, would I be forced to sell it?
>
> Mr. Sinnott: The stock could be declared forfeited, under the forfeiture clause in the bill.
>
> Mr. Snell: *There is no protection then for any foreigner who happens to own stock in one of our oil companies, is there?*

---

[4] The language in the Senate bill that was rejected by the House Committee had provided that "no alien shall . . . own any interests in a lease" under the Act "except with a specific provision in such lease authorizing the President, in his discretion, to take over and operate such lease, paying just compensation" to its owner, and provided further that "the Secretary of the Interior may require the sale for consumption in the United States of all or any portion of the products of any leased property in which it appears that any alien has an interest by stock ownership or otherwise." 58 Cong. Rec. 4160 (1919).

Mr. Sinnott: *Not if his Government denies us the same rights.*

58 Cong. Rec. 7528 (1919) (emphasis added). Although the specific question posed above by Congressman Snell dealt with England, a country described as not allowing "any alien" to own "any oil lands," and thus presented an example of the type of case in which a flat ban would logically apply, Congressman Sinnott did not say that English citizens would be denied "any" rights to own federal mineral resources under the legislation. Rather, he explained that "we meet that discrimination [by a foreign nation] by denying to its citizens the rights that are withheld from us." This statement reflects a reciprocity principle under which the United States would be able to respond to another country's restrictive practices by "meeting" the other country's discrimination, in short, by responding in kind.

We also understand from conversations with legal staff of the Department of Interior that § 181 has not been read in the past as barring, and the Mineral Leasing Act as a whole has been read as authorizing, responsive "mirroring" action by the Secretary when another country restricts foreign investment in its mineral resources. For instance, we have been told that after Sweden and the Philippines placed restrictions on the percentages of permissible foreign ownership of their mineral resources, the Secretary imposed corresponding restrictions on the permissible percentages of Swedish and Philippine ownership of any corporation having a federal mineral lease. The courts have acknowledged that the interpretation of a statute by the agency charged with implementing it is entitled to some independent weight, barring contrary legislative language, purpose, or history. *See, e.g., Red Lion Broadcasting Co. v. FCC,* 395 U.S. 367, 381 (1969); *see also General Electric Co. v. Gilbert,* 429 U.S. 125, 141 (1976). In this case, there is no such contrary indication regarding § 181 of which we are aware.

### Conclusion

We conclude that the Mineral Leasing Act, including § 181, permits the Secretary to respond in kind when another country restricts American investment in its minerals.[5] In concrete terms, this principle would

_____

[5] We do not believe an equal protection argument could be successfully raised against this interpretation Distinctions may be made on the basis of nationality by Congress or the Executive Branch so long as they rest on a sufficient rational foundation. *See, e.g., Narenji* v. *Civiletti,* 617 F.2d 745 (D.C. Cir. 1979), *cert. denied,* 446 U.S. 957 (1980), and cases cited therein. Moreover, we do not believe that treaties in force would present a serious problem. It is our understanding that the Secretary would act only in cases in which a foreign power already had imposed restrictions of a similar kind. If there were an outstanding treaty of friendship, commerce, and navigation with the country of concern, the initial imposition of a restriction by our treaty partner would presumably be based on one of two possible assumptions. (1) that such action does not violate the treaty, in which case this country could act similarly without violating the treaty, or (2) that such action violates the treaty, in which case the breach by our treaty partner would leave us free to act reciprocally. *See* Vienna Convention on the Law of Treaties, S. Ex. L , 92d Cong., 1st Sess. (1971), Art 60.

253

not appear difficult to apply in most cases, for instance in cases involving another country's restriction on the percentage of foreign ownership of corporations having interests in its mineral resources, or a restriction on any investment at all in a certain type of mineral covered by the Act. There may be other kinds of restrictions—for instance, changes in a foreign country's tax laws that would discourage investment in mineral resources by corporations having a certain percentage of foreign stockholders—that would be more difficult for the Secretary to "mirror," if only because the Secretary may lack authority to take the necessary "mirroring" action (*e.g.*, changing the tax laws of the United States in parallel fashion). In such cases, a question would arise whether other actions could be taken by the Secretary that would, in substance if not precisely in form, correspond sufficiently with the foreign nation's restrictions to permit the conclusion that "similar or like privileges" would be restored by such actions. Each situation must be approached on a case-by-case basis. However, we believe that the Secretary would be recognized by a reviewing court as having a reasonable degree of discretion in applying § 181 in a practical, flexible manner. *See* 38 Op. Att'y Gen. 476 (1936).[6]

THEODORE B. OLSON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[6] This discussion has focussed on the application of § 181 to new mineral leases or changes in existing mineral leases. Additional issues would be raised if the Secretary sought to seek judicial cancellation of existing leases because of action by a foreign country denying "similar or like privileges" to American investors. We would be glad to provide advice in such situations should the occasion arise. *See generally* 30 U.S.C. §§ 184(h)(1) & 188(a); *Dames & Moore* v. *Regan,* 453 U.S. 654 (1981).