**DEPARTMENT OF DEFENSE, Department of the Army, and Headquarters, Eighth U. S. Army Garrison, Yongsan, Korea, Petitioners,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent,**

National Federation of Federal Employees, Intervenor.

**DEPARTMENT OF DEFENSE, et al., Petitioners,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent,**

National Federation of Federal Employees, Intervenor.

**Nos. 80–2310, 80–2341.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 1, 1982.

Decided Aug. 6, 1982.

Howard S. Scher, Atty., Dept. of Justice, Washington, D. C., with whom Thomas S. Martin, Acting Asst. Atty. Gen., at the time the brief was filed, Washington, D. C., William Kanter, Dept. of Justice, and Peter B. Loewenberg, Atty., Dept. of the Army, Washington, D. C., were on the brief, for petitioners.

William Eugene Persina, Atty., Federal Labor Relations Authority, Washington, D. C., with whom Mary Elizabeth Medaglia, Associate Sol., Federal Labor Relations Authority, Washington, D. C., was on the brief, for respondent. Steven H. Svartz, Atty., Federal Labor Relations Authority, Washington, D. C., also entered an appearance for respondent.

Catherine Waelder and Patrick J. Riley, Washington, D. C., were on the brief, for intervenor.

Before WALD, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Opinion filed by Circuit Judge GINSBURG, dissenting in part.

MIKVA, Circuit Judge:

We deal here with the perhaps unavoidable tension between two important areas of national policy: federal employee labor relations and the United States military presence in allied countries. In general, we are called upon to examine the relationship between the Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101–7135 (Supp. IV 1980) (the statute), and Army regulations governing the conduct of United States personnel in South Korea, promulgated pursuant to the Mutual Defense Treaty, Oct. 1, 1953, 5 U.S.T. 2368, T.I.A.S. No. 3097, and an executive agreement, the Status of Forces Agreement, July 9, 1966, 17 U.S.T. 1677, T.I.A.S. No. 6127 (SOFA). Specifically at issue is whether regulations dealing with the registration of privately owned motor vehicles and the rationing of consumer goods are mandatory subjects for collective bargaining.

The union representing a group of civilian employees attached to the U. S. forces in Korea proposed to bargain with the employer over the regulations. The Army declined to bargain, asserting that to do so would interfere with its management role and run counter to United States treaty obligations. The Federal Labor Relations Authority (FLRA) determined that bargaining about both sets of regulations was required. We review that determination on this appeal. We conclude that the FLRA's bargaining order must be enforced with respect to the rationing regulations. With regard to the motor vehicles regulations, we are unable to determine just what the union was proposing, and we therefore remand for clarification.

## I. BACKGROUND

In order to provide the background for an analysis of the issues presented by this case, we first discuss the relevant provisions of the statute. Next we describe the operation of the Mutual Defense Treaty and SOFA, as well as the regulations at issue. Finally, we summarize the union's bargaining proposals.

## A. *The Statute*

The Federal Service Labor-Management Relations Statute was enacted on October 13, 1978, as Title VII of the Civil Service Reform Act of 1978, Pub.L.No.95–454, 92 Stat. 1191. Based on the recognition by Congress that "labor organizations and collective bargaining in the civil service are in the public interest," 5 U.S.C. § 7101(a) (Supp. IV 1980), the statute establishes a comprehensive scheme to deal with labor relations in federal employment.[1] Many of the features of the scheme are familiar because they are closely analogous to the law that has developed with regard to the private sector.

■ One such feature is the duty of agencies and labor organizations to bargain in good faith; the scope of that duty is central to the resolution of the issues in this case. Once an agency has recognized a union as the exclusive representative of the employees in a bargaining unit, the two sides must "meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement," *id.* § 7114(a)(4). The duty to bargain includes any "condition of employment," *id.* § 7114(b)(2), which in turn is defined to include "personnel policies, practices, and matters, whether established by rule, regulation or otherwise, affecting working conditions," *id.* § 7103(a)(14).

■ The scope of the duty to bargain in the context of federal labor relations is subject to a number of important limitations, several of which are relevant to this case. First, the definition of a "condition of employment" excludes matters to the extent that they are "specifically provided for by Federal statute," *id.* § 7103(a)(14)(C); and the duty to bargain includes matters covered by federal rules or regulations, but only "to the extent not inconsistent with any Federal law or any Government-wide rule or regulation," *id.* § 7117(a)(1). Second, the "management

rights" section of the statute reserves to agencies the exclusive authority to determine their "internal security practices," *id.* § 7106(a)(1), although this reservation is hedged somewhat in that "[n]othing in this section shall preclude any agency and any labor organization from negotiating . . . procedures which management officials of the agency will observe in exercising any authority under this section," *id.* § 7106(b)(2). Finally, the President has the express authority to exclude certain agencies from the operation of all or part of the statute, such as the duty to bargain:

(1) The President may issue an order excluding any agency or subdivision thereof from coverage under this chapter if the President determines that—

(A) the agency or subdivision has as a primary function intelligence, counterintelligence, investigative, or national security work, and

(B) the provisions of this chapter cannot be applied to that agency or subdivision in a manner consistent with national security requirements and considerations.

(2) The President may issue an order suspending any provision of this chapter with respect to any agency, installation, or activity located outside the 50 States and the District of Columbia, if the President determines that the suspension is necessary in the interest of national security.

*Id.* § 7103(b).

The federal employment relations analogue to the National Labor Relations Board is the Federal Labor Relations Authority. The FLRA's general purpose is to "provide leadership in establishing policies and guidance" with regard to matters covered by the statute. *Id.* § 7105(a)(1). In addition, the FLRA has the authority to administer specific provisions of the statute. In this context it is empowered to resolve "issues relating to the duty to bargain in

---

1. For an extensive general discussion of the statute and the functions of the FLRA, see the recent opinion of this court in *Department of Defense, Army-Air Force Exch. Serv. v. FLRA,* 659 F.2d 1140 (D.C.Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

good faith." *Id.* § 7105(a)(2)(E). When an agency maintains that its duty to bargain does not extend to a particular proposal by a union, the union may turn to the FLRA and seek a determination that bargaining is mandatory. The FLRA then requests submissions from the parties, and it may hold a hearing at its discretion before it issues a decision. *Id.* § 7117(c). *See* 5 C.F.R. Part 2424 (1982).

B. *The Treaty, SOFA, and the Regulations*

The United States military presence in South Korea is the subject of the Mutual Defense Treaty of 1953, 5 U.S.T. 2368, T.I.A.S. No. 3097, which states that U. S. forces are to be deployed "as determined by mutual agreement," *id.* art. IV. The mutual agreement implementing the treaty is the Status of Forces Agreement (SOFA) of 1966, 17 U.S.T. 1677, T.I.A.S. No. 6127. SOFA contains provisions governing various aspects of the stationing in Korea of U. S. personnel, including civilian employees attached to the armed forces. The agreement also establishes a Joint Committee, composed of representatives of the Korean and United States Governments, which is to function as "the means for consultation . . . on all matters requiring mutual consultation." SOFA art. XXVIII.

At issue in this case are the provisions of SOFA that deal with the registration of privately owned motor vehicles by U. S. personnel, and with the control of the traffic in consumer goods at facilities such as post exchanges and commissaries. These provisions, together with the U. S. Forces regulations that assertedly implement them, are summarized below.

1. *Motor Vehicles*

Article IX ¶ 3.(b) of the SOFA states that "no duties or charges shall be paid with respect to" vehicles imported by U. S. personnel for the use of themselves or their dependents. Article XXIV ¶ 3. exempts U. S. personnel and their dependents from "all fees and charges relating to the licensing, registration, or operation of vehicles," as well as from most Korean taxes having to do with vehicles. *See also* art. XIV ¶ 3.

(general exemption for movable property with regard to Korean taxes on holding, use, transfer *inter se*, and transfer by death). SOFA does, however, mandate cooperation between the U. S. Forces and the Korean Government to ensure that privileges such as these are not abused, art. IX ¶ 8., and it forbids the transfer of duty-free goods to unauthorized persons, *id.* ¶ 6. In addition, the agreement contains the following specific provision with regard to motor vehicles:

> The Government of the Republic of Korea will license and register those vehicles privately owned by members of the United States armed forces, the civilian component, or dependents. The names of the owners of such vehicles and such other pertinent information as is required by the law of the Republic of Korea to effect the licensing and registration of such vehicles shall be furnished to the Government of the Republic of Korea by officials of the Government of the United States through the Joint Committee.

Art. XXIV ¶ 3.

In 1968 the Joint Committee approved a set of procedures, developed by its Transportation Subcommittee, that were designed to implement SOFA art. XXIV ¶ 3. The procedures describe in some detail how U. S. personnel are to go about registering their vehicles, and how the United States authorities are to convey the information to the Korean Government; generally the requirements imposed on an owner of a vehicle are the same as those contained in Korean law. *See* Joint Appendix (J.A.) 40–45. The U. S. Forces then promulgated USFK Regulation 190–1, *reprinted in relevant part in* J.A. 54–61, which sets out the exact procedures to be employed in vehicle registration.

2. *Rationing*

Article XIII ¶ 1.(a) of SOFA permits the U. S. Forces to set up facilities such as military post exchanges. Such exchanges are exempted from Korean regulations, licenses, fees, taxes, or similar controls, *id.*, and goods imported through them generally

are not subject to customs duties, art. IX ¶ 2., or Korean sales taxes, art. XIII ¶ 2. SOFA forbids the disposition of exchange goods to unauthorized persons, art. XIII ¶ 3. In addition, Article IX ¶ 8., referred to above with respect to vehicles, applies to goods purchased duty-free at exchanges: the U. S. Forces are pledged to take "such steps as are necessary" to prevent the abuse of privileges.

U. S. Forces Regulation 60–1 deals with the supply of goods at military exchanges. It has two express purposes: to comply with SOFA and to ensure the "availability of duty-free goods to all authorized patrons." USFK Reg. 60–1, § I ¶ 1., reprinted in Addendum to Petitioners' Brief (Pet. Br.) at 2a. The regulation sets up authorization requirements and monthly dollar and quantity limits on all manner of consumer items and categories of items, see id. App. D., reprinted in Addendum to Pet. Br. at 8a–11a; it is subject to supplementation upon approval by the commander of the U. S. Forces, see id. § I ¶ 1, reprinted in Addendum to Pet. Br. at 2a. Supplementation with regard to procedures and lists of controlled items is carried out in consultation with the Korean Government through the Joint Committee. See, e.g., Joint Committee Memorandum, March 28, 1972, reprinted in Addendum to Pet. Br. at 43a (discussing recommendation of Joint Committee's Panel on Larceny and Black Marketing regarding listing of additional items and strengthening of control procedures).

## C. The Bargaining Proposals

The two consolidated petitions for review in this case involve the same parties and essentially the same legal issues. On behalf of its members, civilian employees attached to the U. S. Forces in Korea, the intervenor, National Federation of Federal Employees (NFFE or the union) submitted two bargaining proposals to management, the Headquarters, Eighth U. S. Army Garrison, Yongsan (the Army).[2] One proposal dealt with the motor vehicle regulations con-

tained in USFK Regulation 190–1, supra; the other concerned the rationing of consumer goods pursuant to USFK Regulation 60–1, supra. In each instance the Army indicated that it did not consider itself bound to negotiate about the proposals, whereupon the union successfully petitioned the FLRA for a determination that the proposals were mandatory subjects of bargaining. The Army's petitions for review, coupled with the FLRA's cross-applications for enforcement of its orders, then followed.

### 1. Motor Vehicle Registration

In November 1979, a letter to a management representative, the president of NFFE Local 1363 asserted that he had discovered that portions of USFK Reg. 190–1 were being applied in a new way by the Army. The regulation had required that employees register their privately owned vehicles only once; under the new policy, re-registration supposedly was being required upon renewal of insurance, inspection of a vehicle, or renewal of a driver's license. The letter stated, "Rather than propose that the existing policy be returned to the 'status quo' and subsequently become mired in time-consuming correspondence which accomplishes little, we propose that . . . employees . . . be excluded from the provisions of the subject regulation!" See J.A. 12.

The Army refused to bargain over the union's proposal. In its submission in response to the union's ensuing petition to the FLRA for a determination of negotiability, the Army stated that it did not know whether the union's phrase "provisions of the subject regulation" referred to the entire USFK Reg. 190–1, or merely to two paragraphs dealing with the details involved in the registration of vehicles. See J.A. 18. In its own submission to the FLRA, the union responded:

[W]e concede that our proposal might not be perfectly clear to someone nearly 12,-

2. Petitioners in this case are the Department of Defense, the Department of the Army, and Headquarters, Eighth U. S. Army Garrison, Yongsan, Korea. We refer to them collectively as "the Army."

000 miles away. However, rest assured that local officials of USFK/EA [Eighth Army] know exactly what we mean; which is "that the employees of the *bargaining unit* be excluded from *these* (paragraphs 3–6 and 3–7) provisions of the regulation."

J.A. 24 (emphasis in original). In the next paragraph of its submission the union took issue with the Army's suggestion that the bargaining proposal lacked specificity: "It is perfectly clear that we wish to be exempt from registering our privately owned vehicles and wish to negotiate over that issue. How this can be interpreted as 'lacking specificity' is beyond comprehension." J.A. 25.

### 2. Ration Control

In October 1979, the Army announced that it intended to implement a number of changes in USFK Regulation 60–1, which placed limits on the availability of certain consumer goods to purchasers at post exchanges. Some items were to be retained on the list of items for which Army authorization was required before purchase; other items were to be added to that list. In addition, dollar and quantity limits were to be placed on purchases of a number of items and classes of items. *See* J.A. 73–77. The union proposed to bargain about these changes. Its proposal consisted of suggestions that none of the Army's proposed changes be applied to members of the bargaining unit: items should be deleted from or not added to the authorization list, and no dollar or quantity limits should be placed on items or categories of items. *See* J.A. 79–80.

### II. DISCUSSION

In its pleadings before the FLRA and its briefs and arguments to this court, the Army offered three independent reasons why the union's proposals are not proper subjects for bargaining: (1) they do not pertain to conditions of employment; (2) they involve the internal security practices of the employing agency; and (3) they are inconsistent with federal law. We deal with each point in turn.

### A. Conditions of Employment

The statute extends management's duty to bargain to "conditions of employment," 5 U.S.C. § 7114(b)(2) (Supp. IV 1980). That term is defined to include "personnel policies, practices, and matters, whether established by rule, regulation or otherwise, affecting working conditions," *id.* § 7103(a)(14).

In its orders in these cases, the FLRA specifically determined that vehicle registration and ration control were matters involving personnel policies and practices affecting the working conditions of civilian employees in Korea. With regard to the motor vehicle regulations, the FLRA noted that possession of a duty-free vehicle in Korea was attendant on employment by the Army, and that an employee's failure to comply with the regulations could result in sanctions by the employer. *See National Federation of Federal Employees, Local 1363 and Headquarters, U. S. Army Garrison, Yongsan, Korea*, FLRA Case No. O–NG–234, 4 F.L.R.A. No. 8, at 3 (1980). With respect to the ration controls, the FLRA found that they came within the duty to bargain because they were related to the employer's duty, imposed by its own regulations, to provide certain essential facilities and services to all civilian employees serving overseas. *See National Federation of Federal Employees, Local 1363 and Headquarters, U. S. Army Garrison, Yongsan, Korea*, FLRA Case No. O–NG–226, 4 F.L.R.A. No. 23, at 3 (1980).

We see no reason to disturb these decisions of the FLRA. It is true that the phrase "conditions of employment" is not a model of precision—no doubt purposely so. The definition in 5 U.S.C. § 7103(a)(14) does not really help matters much. Plainly the duty to bargain is expressed on such a level of generality that reasonable persons could reach opposite results in specific cases. But we are to set aside the FLRA's determination only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) (1976). In addition, this is a

proper case for the application of the familiar principle that "great deference" is owed "to an interpretation of a statute by the agency entrusted with its administration," *Department of Defense, Army-Air Force Exchange Service v. FLRA*, 659 F.2d 1140, 1161 (D.C.Cir.1981), *cert. denied sub nom. American Federation of Government Employees v. FLRA*, —— U.S. ——, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982). The FLRA's admittedly broad reading of the statute with regard to conditions of employment is reasonable, even if a court could conceivably come out the other way on *de novo* review of the issue.[3] Consequently we uphold the FLRA to this extent.

### B. Internal Security Practices

█ The authority of management "to determine the ... internal security practices of the agency" is preserved under 5 U.S.C. § 7106(a)(1) (Supp. IV 1980). In its pleadings before the FLRA with regard to the ration control program, and in its brief dealing with motor vehicle registration, the Army asserted that the union's bargaining proposals were inappropriate because of this reservation of rights to management. The Army maintains that it indisputably has the right, under section 7106(a)(1), to ensure the physical security of goods in its possession; one purpose so served is the discouragement of black marketeering. Because black marketeering continues to be a threat when consumer goods have left the post exchange (or when vehicles are in the possession of employees), the Army asserts a sort of ongoing "constructive" possession over the items. Consequently its internal security practices include regulations affecting external matters.

We decline the Army's invitation to engage in the kind of mental acrobatics involved in such a far-fetched theory. The Army's argument bends the statutory language out of its intended shape. The statute in other places does make ample provision for the protection of the kind of interest that the campaign against black marketeering may indeed be said to involve: not "internal security practices," but "national security." *See* 5 U.S.C. § 7103(b) (Supp. IV 1980); discussion at pages 650–51 *infra*.

### C. Consistency with Federal Law

The Army insists that the proposals, if implemented, would be inconsistent with federal law. It is not disputed that, as an international executive agreement, SOFA may be regarded as equivalent to a treaty and therefore as federal law. *See B. Altman & Co. v. United States*, 224 U.S. 583, 601, 32 S.Ct. 593, 597, 56 L.Ed. 894 (1912). What is at issue is whether the Union's proposals conflict with SOFA[4] in either of two ways: whether they trench on matters "specifically provided for by Federal statute," 5 U.S.C. § 7103(a)(14)(C) (Supp. IV 1980), or more generally, whether they are "inconsistent with any Federal law," *id.* § 7117(a)(1).

#### 1. Specific Provisions of SOFA

█ a. *Motor Vehicles*. As described in Part I. B. 1. above, SOFA specifically exempts vehicles owned by U. S. personnel from Korean duties and taxes, *see* art. IX ¶ 3.(b); *see also* arts. XXIV ¶ 3., XIV ¶ 3. And art. XXIV ¶ 3. provides that the Republic of Korea "will increase and register those vehicles privately owned" by U. S. personnel, and that whatever information is required by Korean law for vehicle registration "shall be furnished" to the Korean government by U. S. officials. We discern no ambiguity in this language. It plainly

---

3. We note also that the FLRA has shown consistency in giving a broad reading to the "condition of employment" language. *See, e.g., American Fed'n of Gov't Employees, AFL–CIO and Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio*, 2 F.L.R.A. 603, 606, 616–17 (1980), *enforced, Department of Defense, supra* (matters such as facilities and equal employment opportunity programs were within scope of conditions of employment).

4. Although the dissent notes that the Army's SOFA-related claims received "abbreviated consideration" by the FLRA, Dissenting opinion note 1, they were addressed by the FLRA on the merits. Moreover, that the Army was tardy in raising these contentions suggests that they were an afterthought that even the Army did not consider to carry much weight.

indicates that all privately owned vehicles will enjoy duty-free status, that regulation of all those vehicles will conform to the requirements of Korean law, and that the United States has a duty to provide information.

Despite the clarity of the language in SOFA, however, the FLRA determined that bargaining must take place with regard to whether the employees represented by NFFE should have to register their vehicles with the Army at all. The reason given was that SOFA could not be said to mandate only one registration procedure, because an alternative procedure existed: direct registration with the Korean government, a procedure basically the same as that required by the Army in USFK Reg. 190–1, but one that would subject the owner to the payment of import duties. *See* Order Denying Request for Reconsideration, J.A. 65, 66. The source for this conclusion was the apparent concession by the Army, in its motion for reconsideration, *see* J.A. 33, 36, that there were two ways to accomplish motor vehicle registration.

Nothing in SOFA points to the existence of an alternative registration procedure. Even if it were possible to determine that SOFA applied only to duty-free vehicles, allowing those wishing to pay the duty to register directly with the Korean government, it defies common sense to conclude that the union was proposing exemption from the Army's procedure and adherence to the alternative procedure. First, we are at a loss with respect to the possible motivation for a union to engage in bargaining over something that, according to the FLRA, its members already possess: the freedom to choose between two registration procedures. Second, there is no conceivable reason why the union would prefer direct registration over adherence to USFK 190–1. Both procedures involve the same burden of compliance, because the latter tracks the former. Finally, there is no discernible advantage to be gained from direct registration that could be viewed as outweighing the significant disadvantage incurred by the loss of duty-free status.

We must conclude, therefore, that the union's proposal concerned the registration of *duty-free* vehicles. The problem that remains is deciding whether the proposal sought exemption from all registration requirements, or whether the union was merely trying to negotiate about specific details contained in USFK Reg. 190–1. It is impossible to resolve this issue on the record before us. The union's submissions, as quoted in Part I. C. 1. above, are hopelessly ambiguous in this respect. Consequently we must remand the issue to the FLRA, in order that it may do whatever is necessary to inform itself of the union's real position. The FLRA at that point can make the simple determination about whether the union's proposal would lead to a violation of specific terms of SOFA. If the union wants complete freedom from registration, or if it seeks exemption from any part of the requirements that merely track applicable Korean law, then the proposal would be deemed inappropriate for bargaining. If, on the other hand, the union is found to be proposing deviations from USFK Reg. 190–1 that do not run counter to the requirements of SOFA and the Korean law incorporated therein, nothing would stand in the way of a decision in favor of negotiability.

■ b. *Rationing.* Nowhere in SOFA is there any specific mention of rationing of consumer goods to employees of the U. S. Forces. Rather, there is the indication that U. S. officials will take "such steps as are necessary" to prevent abuses associated with the duty-free importation of goods. *See* art. IX ¶ 8. In addition, portions of the Agreed Minutes to SOFA state that duty-free treatment of goods distributed through post exchanges will be applied "under such regulations as the United States armed forces promulgate," and that the quantity of duty-free goods will be "limited to the extent reasonably required" for the use of authorized personnel. *See* Agreed Minutes to SOFA art. IX ¶ 2, 17 U.S.T. at 1770, 1771.

We agree with the FLRA that these sources by no means require that a rationing program be conducted in any particular

way; in fact, they do not require that a rationing program be set up at all. Consequently, the union's proposal that it be subjected to no rationing cannot be said to contradict the specific provisions of SOFA.

### 2. Inconsistency with SOFA

The Army points out that both the motor vehicle regulations and the ration control regulations were developed by the Joint Committee in furtherance of general goals contained in the SOFA. To require bargaining over regulations of this sort, the Army asserts, would constitute an unwarranted intrusion on the power of the executive branch to conduct foreign policy. The Joint Committee mechanism would be rendered unworkable, and the United States-Korean cooperation that is at the heart of the Mutual Defense Treaty and SOFA would be undermined.

This is a serious concern, and it merits careful consideration because it is based on the interpretation of what is in effect a statute by the Army as the agency entrusted with its execution. We are unable to defer to the Army's interpretation, however, because there are two "compelling indications that it is wrong," *Miller v. Youakim*, 440 U.S. 125, 145 n.25, 99 S.Ct. 957, 969 n.25, 59 L.Ed.2d 194 (1979) (quoting *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) (footnote omitted)).

First, to accept the Army's argument about the primacy of the Joint Committee's position in implementing SOFA would lead to a result that Congress plainly cannot have intended in enacting the Federal Service Labor-Management Relations Statute. As indicated in a letter filed with this court by counsel for the petitioners in response to a question at oral argument, there is a SOFA in effect in every country where there is a significant concentration of American personnel, and each SOFA provides for cooperation between the United States and the host country in the implementation of regulations concerning duty-free vehicles and consumer goods. Given our approval of the FLRA's finding that matters such as vehicle registration and ration programs are within the scope of the term "conditions of employment," immunizing the actions of bodies such as the Joint Committee from labor-management negotiation would render the statutory duty to bargain a dead letter outside of the boundaries of the United States.[5]

Second, to the extent that the FLRA's broad reading of the term "conditions of employment" may cause difficulties in relations with our military allies, the statute provides a specific remedy. Under section 7103(b), the President is empowered to exclude an agency from the operation of the statute if he determines that the agency's primary function involves national security work; he also may suspend the application of any provision of the statute to an "agency, installation, or activity" located overseas if he determines that national security interests are involved. We believe that this provision of the statute allows for a balanced disposition of whatever conflicts may arise between the policy in favor of collective bargaining by federal employees and the interest in preserving our national security. Nothing precludes the Army from implementing SOFA by means of cooperative efforts with representatives of allied countries. But when collective bargaining is asserted to interfere with those efforts, and consequently to pose a threat to national security interests, it is for the President alone to invoke the protective provisions of the statute. The Army, like any other federal employer, may not arrogate to itself the President's power in this regard; it must adhere to its statutory duty to bargain in good faith with its civilian employees.

---

**5.** The dissent rightly points out that the Joint Committee's actions on duty-free vehicles and consumer goods would render the statutory duty to bargain a dead letter only with regard to these areas. Dissenting opinion at 652, but giving such preemptive effect to Joint Committee actions would allow the Army to avoid bargaining by simply extending Joint Committee actions into any additional areas in which the Army wished to avoid its bargaining responsibilities.

In the case before us, then, we decline to hold that a finding of negotiability with regard to the union's proposals would contravene the general policies of the SOFA. That bargaining over the motor vehicle and rationing regulations may produce undesirable results from a national security standpoint is a separate question, one that we are not called upon to address. As we have indicated, it is for the Army to call such a situation to the attention of the President;[6] the statute adequately and effectively provides for such a possibility.

## CONCLUSION

■ We have accepted the FLRA's findings in both cases under review that the union's bargaining proposals involve conditions of employment and do not implicate the agency's internal security practices. In neither case do the proposals run counter to the general policies of SOFA. With regard to No. 80–2341, concerning the rationing program, we also find no inconsistency between the union's proposal and any specific provision of SOFA. Consequently the petition for review in that case is denied, and the FLRA's cross-application for enforcement of its order is granted. In No. 80–2310, concerning motor vehicle registration, we remand for a clarification of the union's proposal and a new determination of whether that proposal creates a conflict with the express provisions of SOFA dealing with duty-free vehicles.

*It is so ordered.*

GINSBURG, Circuit Judge, dissenting in part:

I keep pace with the court two-thirds of the way, but break from the majority's position on the consistency of the union's proposals with the relevant Status of Forces Agreement (SOFA), 17 U.S.T. 1677, T.I.A.S. No. 6127 (July 9, 1966). I would not decide that important issue on the sparse record before us,[1] but would return the question to the Federal Labor Relations Authority (FLRA or Authority) for a full airing. I would require the FLRA not only to "do whatever is necessary to inform itself of the union's real position" with respect to vehicle registration, Majority opinion at 649, but also to reconsider, on a more complete record, whether SOFA and its implementing regulations permit collective bargaining on the subjects of registration and rationing.

The court, in my judgment, appropriately accepts the FLRA's determinations that the union's bargaining proposals involve "conditions of employment" and do not implicate the agency's "internal security practices." Issues of this sort are standard fare for the Authority. On both questions, our precedent calls for "great deference" to the FLRA's interpretation of the law Congress has charged the Authority to administer, the Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101–7135 (Supp. IV 1980). *See Department of Defense v. FLRA*, 659 F.2d 1140, 1161 (D.C. Cir.1981), *cert. denied sub nom. American Federation of Government Employees v. FLRA*, —— U.S. ——, 102 S.Ct. 1443, 71 L.Ed.2d 658 (1982).

But SOFA interpretation is not the Authority's specialty. Concededly, the FLRA brings no expertise to bear, and is owed no deference, on questions concerning the scope of SOFA "law." Indeed, the court acknowledges that the Army, not the Authority, is expert and ordinarily entitled to deference on matters concerning SOFA. Majority opinion at 650. Nonetheless, the majority concludes that the Army, in this instance, is "wrong," *id.* at 650, therefore the Army's view of what constitutes SOFA "law" cannot prevail.

The Federal Service Labor-Management Relations Statute, all agree, does not autho-

---

6. Indeed, counsel for petitioners has indicated in a letter to the court that this has already been done.

1. The SOFA did not figure in these cases until the Army's requests for reconsideration. *See* Joint Appendix (J.A.) 33, 102. Although the Federal Labor Relations Authority addressed the requests on the merits, *see* J.A. 65, 114, the matter received abbreviated consideration.

rize bargaining that would be "inconsistent with any Federal law." 5 U.S.C. § 7117(a)(1). SOFA, it is not disputed, qualifies as "Federal law" comprehended by this provision. *See* Majority opinion at 648. According to the Army, SOFA "law" encompasses, in addition to the executive agreement itself, Army regulations tightly tied to SOFA provisions—regulations, shaped in consultation with representatives of the host nation, that comply with or implement specific SOFA provisions and advance the general policies of SOFA. The court reads SOFA "law" for the purpose at hand less generously. It is not enough, the majority reasons, that the regulations a union would bargain about constitute one way to implement SOFA's express terms and serve the general policies of SOFA. Like the FLRA,[2] the court apparently believes that a regulation does not count as SOFA "law" unless it is mandatory, specifically required by the executive agreement, the only way the Army could carry out the agreement. The court offers two reasons for so circumscribing SOFA "law." Neither is fully persuasive.

First, the court notes the existence of a SOFA wherever the United States has a significant military presence, and of provisions in each SOFA resembling those in question here—provisions calling for United States-host nation cooperation in devising, implementing, and preventing abuse of regulations concerning duty-free vehicles and consumer goods. Majority opinion at 650. From this, the court concludes that immunizing registration of duty-free vehicles and sales of untaxed consumer goods from labor-management negotiation "would render the statutory duty to bargain a dead letter outside of the boundaries of the United States." *Id.* (footnote omitted).

I cannot leap, as the court does, from duty-free vehicles and consumer goods to all manner of items on which a union might wish to bargain. The record before us is entirely void on the question of the range of matters the Army conceives to be bargainable under its interpretation of SOFA constraints. The court's "dead letter" conclusion, therefore, is at this juncture not even slimly supported. Indeed, the only clue we have runs counter to that conclusion. The Army has stated, albeit without any bill of particulars, that it "fully recognize[s]" the union's "right and obligation . . . to negotiate with management over conditions of employment." Joint Appendix (J.A.) 85.

Second, the court maintains that Congress intended the President, not the Army, to address situations such as this one. Majority opinion at 650–51. If he is so minded, the President can exclude from Federal Service Labor-Management Relations Statute coverage, in whole or in part, our military installations abroad. 5 U.S.C. § 7103(b)(2). The exercise of that large power could indeed "render the statutory duty to bargain a dead letter outside of the boundaries of the United States." But the provision for such ultimate and sweeping authority hardly demonstrates "compellingly"[3] why the Army's view of what is now inconsistent with SOFA is "wrong."

SOFA accords customs and other exemptions to members of the United States armed forces and United States citizen civilian employees stationed in Korea.[4] In return, as the court points out, the Army is obliged by the express terms of SOFA to take "such steps as are necessary"[5] to prevent abuse of privileges United States personnel enjoy,

2. *See* J.A. 66, 115–16 (FLRA rulings that bargaining is not excluded by SOFA where the specific regulations in question are not mandated by express terms of SOFA).

3. *See* Majority opinion at 650.

4. SOFA art. IX, ¶¶ 2–3 (customs and duties), art. XIII, ¶ 2 (sales taxes), art. XIV, ¶¶ 2–3 (income, property, estate, and gift taxes), art. XXIV, ¶ 3 (automobile registration and licensing fees).

5. *Id.* art. IX, ¶ 8. The provision reads in full:

The United States armed forces, in cooperation with the authorities of the Republic of Korea, shall take such steps as are necessary to prevent abuse of the privileges granted to the United States armed forces, members of such forces, the civilian component, and their dependents in accordance with this Article. *See also id.* art. XXVIII, ¶ 1 (Joint Committee consultation on implementation of SOFA).

*e.g.*, with respect to the importation of vehicles and post exchange purchases. *See* Majority opinion at 646. Approximately 39,000 members of the United States armed forces and 1,100 United States civilian employees served in Korea when the Army was asked to bargain about vehicle registration and post exchange rationing for the benefit of the approximately 235 persons in the unit represented by the union. J.A. 85. The majority believes that reading SOFA to exclude these matters from bargaining would yield "a result that Congress plainly cannot have intended in enacting the Federal Service Labor-Management Relations Statute." Majority opinion at 650. What Congress did or did not intend as to the novel issue here is less clear to me. I do not agree that the matter is free from doubt. Rather, I seriously question whether Congress intended, when it enacted the Federal Service Labor-Management Relations Statute, that it would take a Presidential decree to place some 235 union-represented civilian employees on the same footing as over 40,000 other Americans stationed in Korea with respect to the binding force of SOFA-implementing vehicle registration and post exchange purchase regulations.

In sum, I believe the court's decision, in common with the FLRA's orders under review, disposes of a matter of "serious concern" without "careful consideration." *See* Majority opinion at 650. I would vacate the Authority's bargaining orders and remand these cases for a fresh determination, on a developed record, of the inconsistency *vel non* of the union's proposals with SOFA. Such a remand could assure informed determination whether the Army's SOFA-inconsistency argument, if accepted by the FLRA, would in fact render the duty to bargain a "dead letter" or, on the contrary, whether that argument recognizes as untouched by the executive agreement a range of bargainable issues. The remand could also assure secure determination whether, in view of conditions prevailing in Korea, the regulations at issue are not ap-

propriately tailored to SOFA's provisions and purposes or, on the contrary, whether they qualify as "essential components" of the Army's SOFA-compliance plan [6]—"steps . . . necessary" to prevent abuse of privileges accorded United States personnel under SOFA.[7]

---

6. *See* J.A. 108.

7. SOFA art. IX, ¶ 8, set out *supra* note 5.