**MONTANA GRAIN ELEVATOR ASSO- CIATION, et al., Plaintiffs,**

v.

**John H. RILEY, et al., Defendants.**

**Civ. A. No. 84–1015.**

United States District Court, District of Columbia.

Aug. 31, 1984.

J. Raymond Clark, Mary Foldes, Washington, D.C., for plaintiffs.

Judith Bartnoff, Asst. U.S. Atty., for John H. Riley and Federal Railroad Admin.

Brian L. Troiano, Thomas M. Auchincloss, Jr., Rea, Cross & Auchincloss, Washington, D.C., for Port of Mont. and State of Mont.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

This proceeding, brought by the Montana Grain Elevator Association ("Montana Grain") and the co-plaintiff, Broadwater Grain and Supply, Inc. ("Broadwater Grain"), seeks a review of action taken by the Federal Railroad Administration ("FRA"), through its Administrator, in providing federal funds for the construction of a grain transloading facility. In 1978, the Congress enacted the Local Rail Service Assistance Act ("LRSA"), Pub.L. 95–607, which amended 49 U.S.C. § 1654(f). That section of the statute authorized the Secretary of Transportation to provide financial assistance to states for rail freight assistance programs, including the cost of constructing rail or rail-related facilities for the purpose of improving the quality and efficiency of rail freight service. The Secretary's authority was delegated to the FRA and to its Administrator.

The plaintiffs request the Court to set aside the FRA's approval of applications by the State of Montana to use federal local rail service assistance funds for the construction of a grain transloading facility to be located near Butte, Montana. They also seek to enjoin any further disbursement of federal funds for the construction and operation of the "non-rail" facility at Butte, Montana.

The parties agree that there are no disputed material facts, and thus the matter is presented for resolution on the merits. Cross motions for summary judgment have been filed. The various legal memoranda and affidavits filed by the parties have been considered, together with the oral arguments advanced at the hearing on the summary judgment motions.

The Court concludes that the plaintiffs' application for relief and motion for summary judgment should be denied, and that the Federal Railroad Administration and its Administrator acted within the scope of their delegated statutory authority. The reasons for that determination are set out below.

## BACKGROUND

Plaintiff Montana Grain is an unincorporated trade association domiciled in the State of Montana. Its members are engaged in the operation of grain storage elevators and the buying and selling of grain and grain products in Montana. Broadwater Grain, a member, is a Montana corporation engaged in the storage and marketing of grain, feed and farm supplies. The defendants are the Federal Railroad Administration, the Administrator of that federal agency in his official capacity; the State of Montana and the Port of Montana, a nonprofit corporation of the State of Montana.

Section 1654(f)(4) of Title 49 authorizes the Secretary of Transportation to provide financial assistance to states for rail freight assistance programs designed to cover the cost of constructing rail or rail related facilities for the purpose of improving the quality and efficiency of rail freight service. In carrying out the mandate of section 1654, the Secretary's responsibilities have been delegated to the Federal Railroad Administrator. 49 C.F.R. § 1.49(t). The agency's regulations governing projects seeking federal financial assistance are codified at 49 C.F.R. Part 266.

The facility which is the center of dispute is a grain subterminal. Following extensive study, the State of Montana, through its Department of Commerce, determined that the proposed grain subterminal would enhance the agricultural economy of the entire state by providing grain producers expanded access to new markets through direct single-line rail service to the West Coast. The project was specifically designed for the purpose of enhancing the

underutilized rail capacities of the lines serving the affected areas. It was anticipated that the proposed terminal would draw grain by truck from a 16 county area in the southwest and south central portions of Montana for transloading and shipment on rail car unit trains. It was further expected that the facility's ability to generate unit train traffic would significantly improve the quality and efficiency of rail freight service in Montana. (Affidavit of Joanne McGowan, p. 3, paragraph 6; filed May 23, 1984.)[1]

The project is located near Butte and Silver Bow, Montana, near the intersection of two interstate highways and the intersection of the Union Pacific and Burlington Northern Railroads. The facility would accommodate 500,000 bushels of grain and is designed to accept and convey grain for transloading from truck to the terminal and from the terminal to rail car. It would include 7,000 feet of rail trackage, a rail car mover, load out spout, grain distributor, receiving pit, conveyor systems, scales and storage bins. (McGowan Affidavit, p. 2, paragraph 3, *supra*.)

The proposed facility would receive grain by truck from local farmers. The grain would be stored at the terminal for subsequent shipment by rail to markets on the West Coast. The project is designed to facilitate the transfer of cargo from motor carrier transportation to rail transportation. It would be served by the Union Pacific Railroad. Access to the Burlington Northern Railroad would also be physically possible and facilitated. (Affidavit of John Craig, p. 5, paragraph 13; filed June 1, 1984.)[2] Pursuant to 49 U.S.C. § 1654(k)(2), the Union Pacific certified to the FRA that the railroad carried less than 3 million gross tons per mile over the relevant line segment during the 12 month period ending November 1983. (Craig Affidavit, p. 6, and Attachment F, *supra*.)

The Port of Montana would construct and own the subterminal. In turn, the Port would lease it to an independent grain company to conduct actual operations at the terminal. Numerous operators were solicited by the Port to operate the terminal, including members of Montana Grain, but no interest was expressed. In late 1983, the Scoular Grain Company accepted the Port's offer to lease and operate the facility. (Craig Affidavit, pp. 2–3, *supra*.)

The subterminal rail assistance project was identified and qualified for federal assistance following an extensive feasibility analysis, publication of a 1983 Montana Rail Plan Supplement, and an open public involvement program. The State of Montana submitted its application for federal financial assistance to the FRA in 1983, in accordance with applicable statutory and regulatory requirements. (Craig Affidavit, p. 2, *supra*.) The application requested FRA approval to use approximately $1.1 million of previously granted federal funds for construction of the grain subterminal facility. That application was approved on December 14, 1983. Subsequently, on January 23, 1984, the State requested $649,473 in additional federal funds from FRA to construct storage bins at the subterminal facility. (McGowan Affidavit, pp. 2, 4, *supra*.) The latter application was approved by the FRA on May 29, 1984.

Under the applications as approved, the total federal share of funding for the project is $1,092,526 in low interest loans and $649,473 in grants, for a total of $1,741,999. The State assured that those funds will be properly matched in accordance with the statutory formula to fund the balance of the project. (Craig Affidavit, p. 4, *supra*.)

After FRA approval of a project for funding under the Local Rail Service Assistance Act, 49 U.S.C. § 1654, the standard payment procedures prescribed by the Office of Management and Budget govern

---

**1.** Joanne McGowan, Chief of State Programs Division, Office of Federal Assistance, Federal Railroad Administration.

**2.** John Craig, Chief of Intermodal Commodities Bureau, Transportation Division, Montana Department of Commerce.

the disbursement of LRSA funds. The State of Montana met the requirements for advance funding; therefore, upon execution of a grant agreement with the FRA, a letter of credit may be issued for the full amount approved. (Federal Defendants' Answers to Plaintiffs' Interrogatories, pp. 1–2, Answer 1; filed June 20, 1984.) As of June 19, 1984, the federal government had released grant funds totaling $258,090 which had been approved under the applications. That amount was released in the form of a letter of credit issued to the State and was available to be drawn down for construction of the subterminal project. (*Id.*, p. 2, Answer 3.) Contracts for the construction of the facility have been solicited, bid upon and executed.

## ANALYSIS

The plaintiffs advance several arguments in support of the relief they seek: that construction of the subterminal project with federal assistance is inconsistent with the legislative intent and purposes of the Congress; that the project is ineligible for federal funding as a "rail related" project within the meaning of the statute; and is a "non-rail facility"; and that the FRA acted without authority in obligating and disbursing federal funds, and also relied upon belated affidavits to support its actions.

■ The Court rejects the argument that the intent and purposes of the Congress do not support the FRA's participation in and funding of the project. Indeed, the legislative history confirms the intent of Congress to expand the types of projects eligible for assistance beyond those which had been previously permitted. The House Report[3] plainly states that section (f)(4) was added:

... to expand the categories of rail freight assistance available to the States by providing a new type of assistance for which Federal funds may be utilized. The category added is Federal financial assistance to cover the cost of constructing rail or rail related facilities, for the purpose of improving the quality and ef-

ficiency of rail freight service. This category includes, but is not limited to, projects involving new connections between two or more existing lines of railroad, intermodal freight terminals, sidings, and relocation of existing lines of railroad.

As the defendants have urged, the Congress, in enacting section (f)(4), took affirmative steps to expand the types of projects eligible for assistance. The House Report also makes plain that Congress specifically entrusted the FRA with the discretion to determine a project's eligibility. The Report stated:

To qualify for such assistance there must be a reasonable likelihood that a project will improve the quality and efficiency of rail freight service by increasing operating efficiency and promoting the public interest by assuring that adequate levels of service will be provided to the public. These criteria give the FRA sufficient latitude to scrutinize potential projects on a performance improvement and public interest basis and should enable meritorious projects to be rapidly funded without being delayed by procedural minutiae.

*Id.* at 7508.

Section 1654(f) provides in relevant part that rail service assistance grants may be used for:

(4) the cost of constructing *rail or rail related facilities* (including new connections between two or more existing lines of railroad, *intermodal freight terminals*, sidings, and relocation of existing lines) *for the purpose of improving the quality and efficiency of rail freight service.* (emphasis added.)

It is clear from the face of that provision that the authority of the Secretary of Transportation or the FRA Administrator is not limited to providing rail freight assistance to rail facilities only. The statute expressly authorizes assistance to "rail related facilities." Several examples of such related activities, including "intermodal

---

**3.** House Report No. 95–1482, p. 14, reprinted in 1978 U.S.Code Cong. & Ad.News, pp. 7505, 7514.

freight terminals," are then specified. Joanne McGowan, Chief of State Programs for FRA, also points out in her affidavit that the Port of Montana project is a type of intermodal grain facility. McGowan Affidavit at ¶ 6.

 The Administrator's decision is also challenged on the grounds that he failed to make findings and conclusions to support his ultimate approval of the State of Montana project. His decision, however, was informal agency action, and was neither rulemaking nor adjudication. Under the circumstances, detailed findings and conclusions were not required. The course followed by the Administrator was appropriate, and the FRA was justified in relying upon affidavits to explain the reasons for its decision and action. *Camps v. Pitts*, 411 U.S. 138, 142–43, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) (per curiam); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417, 91 S.Ct. 814, 824, 28 L.Ed.2d 136 (1971).

The record in this proceeding clearly shows that the facility is directly related to rail service. It has direct and convenient access to major railroad lines within the State and is located at a point where incoming grain from local producers brought by truck is transferred and subsequently shipped by rail to distant markets. This allows grain to be moved economically to those markets. The facility possesses the basic characteristics of an intermodal terminal. While it may perform other incidental functions, its primary purpose is to accept truck shipments of grain and to consolidate and transfer the grain for shipment by rail.

In addition, the FRA Administrator has determined that the project is consistent with the purpose of the statute, namely that it will improve the "quality and efficiency of rail freight service" in Montana. The Administrator's interpretation of the statute and his judgment that the project complies with the statutory requirements are entitled to deference by this Court. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969); *Udall v. Tallman*, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965).

### CONCLUSION

The Court concludes that the FRA's interpretation of the statute had a reasonable basis in law, and that its approval and funding of the State of Montana's application was within the scope of its delegated authority. Pending at the same time that the Court considered the cross motions for summary judgment was the plaintiffs' application for a preliminary injunction.[4] That motion, as well as the plaintiffs' motion for summary judgment, is denied.

**4.** In view of the above disposition, it is unnecessary to resolve the State of Montana's motion to dismiss.